In re Steven John **MELANDER** and
Debra Jean Melander, Debtors.

No. 13–43877–MER.

United States Bankruptcy Court,
D. Minnesota.

Signed March 13, 2014.

Maureen L. Ventura, Ventura Law Office, LLC, Cottage Grove, MN, for Debtors.

## MEMORANDUM DECISION

MICHAEL E. RIDGWAY, Bankruptcy Judge.

This voluntary chapter 13 case came on for evidentiary hearing before the Court on the verified motion of TCF National Bank ("TCF"), objecting to the Debtors' claim of exemptions, and TCF's verified objection to confirmation of the Debtors' chapter 13 plan dated August 5, 2013. Cameron A. Lallier appeared on behalf of TCF; Maureen L. Ventura appeared for the Debtors. The matter is now ready for resolution.

This is a core proceeding under 28 U.S.C. § 157(b)(2), and this Court has jurisdiction under 28 U.S.C. §§ 157(a) and 1334. The Court makes this memorandum decision based on all the files, records, and proceedings herein, and pursuant to FED. R. BANKR. P. 7052, made applicable to this contested matter by FED. R. BANKR. P. 9014(c). For the reasons set forth below, TCF's motion objecting to the Debtors' claim of exemptions will be granted in part, and denied in part, and TCF's objection to confirmation of the Debtors' chapter 13 plan is sustained, such that confirmation will be denied.

## BACKGROUND

In 2006, the Debtors, Steven Melander ("Steven") and Debra Melander ("Debra"), became indebted to TCF under a promissory note in the original principal amount of $236,000.00; the indebtedness was secured by a second mortgage on the Debtors' former homestead, located at 1028 241st Ave. NE, East Bethel, Minnesota 55055 (the "former homestead"). At the time TCF obtained the second mortgage on the former homestead, it valued the land at $503,500.00. This same property was also subject to a senior mortgage in favor of U.S. Bank. Later, the Debtors attempted to sell the former homestead,

but were unsuccessful. Default and foreclosure proceedings by U.S. Bank followed. As a result of the foreclosure of the first mortgage by U.S. Bank, the balance due TCF became an unsecured debt. According to the Debtors' Schedule F, the amount now owed to TCF is $316,428.76; according to TCF, the amount is $325,182.44. *See* Claim # 1, claims register.

On the petition date of August 5, 2013, Steven was 70 years and Debra was 60 years old. Steven is a retired minister who receives a monthly pension of $2,085.00. He also receives $1,334.00 from Social Security. Debra works at the University of Minnesota as a manager. She commutes 76 miles round trip each workday. She earns $6,768.00 each month. TCF does not challenge the following deductions from that gross amount: $965.00 (payroll taxes), $382.00 (Social Security tax), $90.00 (Medicare), $545.00 (health insurance), $338.00 (mandatory retirement), and $98.00 (parking), for a total of $2,418.00. In addition, Debra also claimed these deductions: long term care insurance—$440.00, voluntary retirement contribution—$216.00, contributions to a health care account—$92.00, and life insurance—$132.00, for a total of $880.00.

Additionally, Steven and Debra have listed two adult daughters, ages 22 and 25,[1] as dependents; accordingly, the Debtors calculated their disposable income based on a household of four. The amounts listed by the Debtors on their Schedule J expenses, as well as on the Official Form 22C—Chapter 13 Statement of Monthly Income and Calculation of Commitment Period and Disposable Income ("Form 22C"), are based on a household of four. The Debtors have claimed virtually all their assets exempt under the federal exemptions.

TCF has objected to confirmation of the Debtors' plan on the following grounds:

a. The plan has not been filed in good faith;

b. The plan fails to meet the best interests test;

c. The Debtors have taken improper exemptions; and

d. The plan does not provide that all of the Debtors' disposable income to be received during the term of the plan will be applied to make payments to unsecured creditors.

TCF has also objected to the following property being claimed exempt at the values stated in Schedule C:[2]

a. The Debtors' homestead, located at 19419 E Front Blvd, NE East Bethel, MN 55092;

b. 2005 Chrysler Sebring, ½ ownership interest of Steven;

c. 2003 Mercury Mountaineer, Steven and Debra;

d. 2001 Jeep Cherokee Laredo, Steven;

e. 1999 Buick Century, Steven;

f. 1998 Cadillac Deville, Steven;

g. 2000 Jet Ski;

h. 1973 12' Fishing Boat;

i. 8' Paddle boat;

j. John Deere Lawn Tractor; and

k. Dock.

In response, the Debtors maintain that their plan is confirmable and that it was filed in good faith. The Debtors also assert that based on the condition of the

---

**1.** The Debtors' schedules list one daughter's age as 26; per Debra's testimony at trial, the daughter was in fact 25 years old as of the petition date.

**2.** The Debtors filed an amended Schedule C on September 12, 2013.

assets, and the values ascribed to them, their exemptions are proper.

The Debtors' chapter 13 plan proposes to pay $130.00 per month for sixty months. The total amount to be distributed to unsecured creditors is $7,020.00; this amounts to a dividend of approximately 2.5%. *See* ECF No. 2.

## DISCUSSION

### A. Burdens of Proof

■■■ TCF, as the party objecting to the Debtors' claimed exemptions, bears the burden of proving that the exemptions are not properly claimed. *See* FED. R. BANKR.P. 4003(c) ("In any hearing under this rule, the objecting party has the burden of proving that the exemptions are not properly claimed. After hearing on notice, the court shall determine the issues presented by the objections."). TCF also has the burden of proving that the Debtors have not applied all disposable income to plan payments. *Education Assistance Corp. v. Zellner*, 827 F.2d 1222, 1226 (8th Cir.1987) ("Since a Chapter 13 plan that meets the requirements of section 1325(a) would be confirmed absent the objections of the creditor, the creditor has, at minimum, 'the initial burden of producing satisfactory evidence to support the contention that the debtor is not applying all of his disposable income' to the plan payments." (quoting *In re Fries*, 68 B.R. 676, 685 (Bankr.E.D.Pa.1986))). It is the debtor, however, "who has the ultimate burden of proving that a plan should be confirmed." *In re Carey*, 402 B.R. 327, 331 (Bankr. W.D.Mo.2009). *See also In re Vantiger–Witte*, 2008 WL 4493426, at *3 (Bankr. N.D.Iowa Sept. 29, 2008) ("Generally, the debtor has the ultimate burden to prove a

Chapter 13 plan meets all the requirements for confirmation...."); *In re Coleman*, 373 B.R. 907, 911 (Bankr.W.D.Mo. 2007) ("The burden of proof in an objection to confirmation in a Chapter 13 case is on the objecting creditor. The debtor then has the burden of coming forward with evidence to rebut any evidence introduced by the objecting creditor."); *In re Maronde*, 332 B.R. 593, 597 (Bankr.D.Minn. 2005) ("Debtor has the burden of proving that the conditions for confirmation have been satisfied."). When a debtor fails to carry that ultimate burden, confirmation must be denied.

### B. Steven's Social Security Income

■■■ In this case, Steven receives $1,334.00 from Social Security, $575.00 of which he is contributing to the Debtors' chapter 13 plan. TCF argues that, "[w]here the debtor voluntarily contributes Social Security Income into the plan to make the plan feasible, he cannot then exclude a portion of the income." *See* Hr'g Br. of Objector TCF National Bank, at 6, ECF No. 22. The Court disagrees.

The Eighth Circuit, in a chapter 7 case, recently determined that the Social Security Act "acts as a complete bar to the forced inclusion of past and future social security proceeds in [a chapter 7] bankruptcy estate." *In re Carpenter*, 614 F.3d 930, 936 (8th Cir.2010). And, citing *Carpenter*, the Eighth Circuit Bankruptcy Appellate Panel ("BAP") recently held that the debtor's retention of Social Security income, in and of itself, is insufficient to find bad faith under 11 U.S.C. § 1325(a)(3). *See Fink v. Thompson (In re Thompson)*, 439 B.R. 140 (8th Cir. BAP 2010).[3] However, in a footnote, the BAP

**3.** On a national level, the majority of courts find that Social Security benefits are not included in projected disposable income, but

that lack of inclusion can be considered in the totality of circumstances when reviewed for good faith. *See, e.g., In re Cranmer*, 697 F.3d

in *Thompson* noted that "[t]his Court does not need to decide whether Social Security income could ever be included in a debtor's projected disposable income." 439 B.R. at 143, n. 3. So, while *Thompson* found *Carpenter* applicable, *Thompson* appears to have left open the question of whether Social Security income could ever be included in a debtor's projected disposable income ("PDI").

In support of its argument regarding Steven's Social Security income, TCF cites to *In re Bottelberghe*, 253 B.R. 256, 261–62 (Bankr.D.Minn.2000) (O'Brien, J.). This case, however, is a pre-BAPCPA[4] case,

and such a proposition would likely be at odds with the spirit of *Carpenter*.

■■■ At this point, a few conclusions become apparent: 1) the Debtors probably could not be *forced* to include all of their Social Security income in their PDI under *Carpenter*; 2) the Debtors are essentially in control of the amount of Social Security that they are *voluntarily* willing to contribute to their plan; and 3) while *Thompson* found that the debtors' retention of their Social Security income, in and of itself, is insufficient to find bad faith under § 1325(a)(3), it can still be considered in a

1314 (10th Cir.2012) (finds that income from Social Security payments need not be included in projected disposable income and that a debtor's proposal of a chapter 13 plan that excludes Social Security income is not bad faith; totality of circumstances test is still considered on a case-by-case basis); *Baud v. Carroll*, 634 F.3d 327 (6th Cir.2011), *cert. denied*, —— U.S. ——, 132 S.Ct. 997, 181 L.Ed.2d 732 (2012) (Social Security benefits should be excluded from the calculation of projected disposable income); *In re Welsh*, 465 B.R. 843 (9th Cir. BAP 2012), *aff'd*, 711 F.3d 1120 (9th Cir.2013) (Social Security benefits do not need to be included in calculation of projected disposable income, but the exclusion could indicate bad faith if coupled with other factors); *In re Ragos*, 466 B.R. 803 (Bankr.E.D.La.2011), *order aff'd*, 700 F.3d 220 (5th Cir.2012) (Chapter 13 debtors' exercise of rights accorded to them by Congress, in devoting only a small portion of Social Security benefits that they received to payment of unsecured creditors under their plan, and in retaining vast majority of these benefits while making less than a 100% distribution on general unsecured claims, did not prevent confirmation of their plan on bad faith grounds, where lesser distribution on unsecured claims was simply the mathematical consequence of Congress's decision to define "disposable income" in manner that excluded Social Security benefits, and there was no evidence that plan was proposed with intent to effectuate any purpose not permitted by the Bankruptcy Code; a chapter 13 debtor's retention of all or part of Social Security benefits, while making less than 100% distri-

bution on general unsecured claims in proposed plan, cannot constitute bad faith in proposing the plan per se, given Congress's exclusion of Social Security benefits from debtor's "disposable income;" rather, debtor's good faith must be examined under totality of the circumstances analysis.); *In re Burnett*, 2011 WL 204907 (Bankr.N.D.N.Y. Jan. 21, 2011) (projected disposable income excludes Social Security benefits, unless the debtor voluntarily devotes that income to the plan); *In re Westing*, 2010 WL 2774829 (Bankr.D.Idaho July 13, 2010) (finding exclusion of Social Security income from plan to be properly considered in totality of circumstances showing lack of good faith). *But see In re Herrmann*, 2011 WL 576753 (Bankr.D.S.C. Feb. 9, 2011) (although Social Security payments are excluded from current monthly income, payments must be allocated to living expenses to satisfy § 1325(a)(3) good faith requirement). *See also Mort Ranta v. Gorman*, 721 F.3d 241 (4th Cir.2013) (when a chapter 13 debtor proposes to use Social Security income to fund a plan, the bankruptcy court must consider that income in evaluating the plan's feasibility under § 1325(a)(6)); *In re Johnson*, 458 B.R. 745 (8th Cir. BAP 2011) (finding that debtors were bound to confirmed plan that included Social Security income regardless of recent case law, unless there was a correlated change in circumstances allowing modification).

4. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 is commonly referred to as the "BAPCPA." P.L. 109–8, 119 Stat. 23 (2005).

totality of the circumstances analysis, but there had better be *other* indicia of bad faith, e.g., misrepresentations or a failure to accurately state their expenses.

The BAP in *Thompson* summed up the inquiry facing the Court, under somewhat similar facts:

> To be confirmed, a Chapter 13 plan must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1325(a)(3). This Court believes that the plain language of the Bankruptcy Code precludes the Trustee from objecting to the Debtors' plan based on an alleged lack of good faith. The plain language of the Bankruptcy Code specifically excludes Social Security income from a debtor's required payments in a Chapter 13 plan. Section 101(10A) defines "current monthly income." 11 U.S.C. § 101(10A). In subsection (B), it explains that current monthly income "excludes benefits received under the Social Security Act." 11 U.S.C. § 101(10A)(B). Section 1325(b)(2)'s definition of "disposable income" specifically incorporates the debtor's current monthly income. 11 U.S.C. § 1325(b)(2). In turn, section 1325(b)(1)(B) requires, as a condition of confirmation, that the debtor's plan "provides that all of the debtor's projected disposable income" during the specified time period be applied to make payments under the plan. 11 U.S.C. § 1325(b)(1)(B). Absent changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation, the debtor's projected disposable income will be limited to his disposable income. *See Hamilton v. Lanning* [560 U.S. 505], 130 S.Ct. 2464, 2478, 177 L.Ed.2d 23 (2010).

\* \* \*

Considering the Debtors' exclusion of their Social Security income from their plan payments as part of the good faith analysis would improperly render section 1325(b)'s ability to pay test meaningless. *See In re Barfknecht,* 378 B.R. 154, 164 (Bankr.W.D.Tex.2007). In addition, the ability to pay test already addresses whether the Social Security income needs to be included in a debtor's plan payments. Considering the same issue under the good faith test would be duplicative. It simply was not bad faith for the Debtors to follow the requirements of the Bankruptcy Code and, in so doing, obtain a benefit provided therein. *See id.* at 165.

Moreover, even if the Debtors' retention of Social Security income could contribute to a finding of bad faith, standing alone it could not prevent the Debtors from establishing good faith under section 1325(a)(3).

The term "good faith" is not defined in the Bankruptcy Code or its legislative history. *LeMaire,* 898 F.2d at 1348. Prior to the enactment of a new section 1325(b) as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98–353 (1984), the Eighth Circuit provided a non-exclusive list of several factors to consider when determining whether the totality of the circumstances showed that good faith existed. *U.S. v. Estus (In re Estus),* 695 F.2d 311, 316 (8th Cir.1982). In *Educ. Assistance Corp. v. Zellner,* 827 F.2d 1222 (8th Cir.1987), the Eighth Circuit considered the effect of the new section 1325(b)'s ability to pay test on the factors set forth in *Estus.* According to the Eighth Circuit, the criteria required by new section 1325(b) "subsumes most of the *Estus* factors." It explained that the court's "inquiry into whether the plan 'constitutes an abuse of the provisions, purpose or spirit of Chapter 13' has a more narrow focus.

The bankruptcy court must look at factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code." *Zellner*, 827 F.2d at 1226–27 (quoting *Estus*, 695 F.2d at 316). In *LeMaire*, the Eighth Circuit explained that "*Zellner* preserved the traditional 'totality of circumstances' approach with respect to Estus factors not addressed by the [1984] legislative amendments." *LeMaire*, 898 F.2d at 1349.

\* \* \*

A determination of bad faith by this Court based solely on the Debtors' failure to contribute all of their Social Security income in their plan would amount to a per se rule that failure to devote Social Security income to plan payments always constitutes bad faith. Like the bankruptcy court, we decline to adopt such a rule.

In addition, section 1306 of the Bankruptcy Code defines property of the Debtors' bankruptcy estate to include all property specified in section 541 existing on the petition date and that the debtor acquires post-petition, as well as the debtor's post-petition earnings. 11 U.S.C. § 1306(a). Recently, the Eighth Circuit ruled that past and future Social Security proceeds are excluded from the bankruptcy estate. *Carpenter v. Ries (In re Carpenter)*, 614 F.3d 930, 936 (8th Cir.2010). It would be inconsistent to say that the Debtors acted in bad faith simply by failing to devote to their plan money that was never property of their estate in the first instance. *Fink v. Thompson (In re Thompson)*, 439 B.R. 140, 143–44 (8th Cir. BAP 2010).

In sum, unless there is some other indicia of bad faith, i.e., undervaluation of the Debtors' vehicles or their homestead (in relation to claimed exemptions), or that the Debtors have improperly claimed expenses, TCF must accept the portion of Steven's Social Security income that he is willing to contribute *voluntarily*.

## C. Valuations

With respect to the various property valuations, the Court now turns to the documentary evidence received, as well as the testimony of the witnesses.

█ On Amended Schedule A, the Debtors attribute a value of $406,172.00 to their homestead. *See* Exs. M (an Anoka County "Valuation Notice" for the property), N (an online Trulia estimate of $263,000.00), and O (another online estimate from Faststart of $272,300.00). The Debtors claim an exemption in the homestead of $39,991.85 under 11 U.S.C. § 522(d)(1). TCF argues that the homestead is undervalued, but the only evidence received in support of this assertion was Ex. 1, which was a "property account summary" for the property from Anoka County, and Ex. 2, which was a Zillow report showing a "Zestimate" of $554,142.00, but which inaccurately reflected that the property had a finished basement. In fact, Debra testified that a Zillow estimate for the property contained some inaccurate information, e.g., it reflected a finished basement, but Debra testified that their property was 70% "slab on grade," with a 30% unfinished, cinder block basement. Debra also credibly testified that until last summer, she had been a licensed real estate agent for a number of years and had a background in real estate, and that, in her opinion, the Debtors' valuation was accurate for the property. *See* Fed.R.Evid. 702. The evidentiary weight of the evidence advanced by TCF in support of its argument that the Debtors undervalued their homestead is simply unreliable. In short, TCF failed to carry its

burden in refuting the Debtors' valuation of the homestead.

■ As to the 2005 Chrysler Sebring, the Debtors attribute a value of $500.00 to the one-half ownership interest held by Steven,[5] in which a $500.00 exemption is claimed under 11 U.S.C. § 522(d)(5). The Debtors offered two valuations for the vehicle. *See* Exs. C and D.[6] TCF offered its separate, higher valuation. *See* Ex. 8. Steven testified that the vehicle had a salvage title, *see* Ex. B, and that the vehicle had over 165,000 miles on it. He also testified that, *inter alia*, the vehicle has a bent frame (from an earlier accident), it burns oil, the power windows do not work, a door does not shut properly and leaks, and the paint is faded on one side of the vehicle. Steven's testimony regarding the condition of the vehicle supported the Debtors' valuation; TCF failed to carry its burden in refuting the Debtors' valuation.

The Debtors value the 2003 Mercury Mountaineer, jointly owned by Steven and Debra, at $3,000.00, with a claimed exemption for that amount under 11 U.S.C. § 522(d)(2). *See* Exs. G and H. TCF offered its separate, higher valuation. *See* Ex. 7. Steven testified that the vehicle has more than 240,000 miles on it; he further testified that, *inter alia*, the vehicle needs a "brake job;" it is leaking "something;" it burns some oil; and it stalls. Steven's testimony regarding the condition of the vehicle was credible, and it supported the Debtors' valuation; TCF failed to carry its burden in refuting the Debtors' valuation.

The Debtors value the 2001 Jeep Cherokee Laredo, owned by Steven, at $1,500.00, with a claimed exemption for that amount under 11 U.S.C. § 522(d)(2). *See* Exs. E and F. TCF offered its separate, higher

valuation. *See* Ex. 6. According to Schedule B, the vehicle's mileage was 252,000 as of the petition date. Steven described the vehicle as a "wreck" and further testified that, *inter alia*, the vehicle had bad "CV joints," which needed to be replaced; the air conditioning had not worked for several years, due to a leak; and the "check engine" light was constantly on. Steven's testimony regarding the condition of the vehicle supported the Debtors' valuation; TCF failed to carry its burden in refuting the Debtors' valuation.

Steven also owns a 1999 Buick Century. The Debtors value it at $300.00, and claim an exemption in it in the same amount under 11 U.S.C. § 522(d)(5). *See* Ex. I. TCF offered its separate, higher valuation. *See* Ex. 4. The vehicle's mileage is 185,000. Steven testified that, *inter alia*, the vehicle needs a "brake job;" burns oil; has a cracked windshield; has a dented passenger side door; and has an intermittent electrical problem that drains the battery. Steven's testimony regarding the condition of the vehicle supported the Debtors' valuation; TCF failed to carry its burden in refuting the Debtors' valuation.

Steven also owns a 1998 Cadillac Deville, which the Debtors value at $300.00; that value is claimed exempt under 11 U.S.C. § 522(d)(5). *See* Ex. J. TCF offered its separate, higher valuation. *See* Ex. 3. The vehicle's mileage is over 219,000. Steven described the vehicle as the "trusty rust bucket," and further testified that, among other things, the vehicle is missing trim; has chipped paint; and leaks transmission fluid. Steven's testimony regarding the condition of the vehicle supported the

---

**5.** The other one-half ownership interest is held by the Debtors' daughter. *See* Ex. B. Steven testified that she drives this vehicle.

**6.** Steven acknowledged that he had mistakenly valued a 2004 model, and not a 2005 model, which he actually owns.

Debtors' valuation; TCF failed to carry its burden in refuting the Debtors' valuation.

Steven also testified regarding the Debtors' joint ownership of a 2000 Polaris "jet ski" (model SLH), which Steven described as "totaled, well, unless you want to pay $5,000.00 to get it fixed." *See* Exs. K and L.[7] Given the June 24, 2013 repair estimate, the Debtors value the jet ski at $600.00; the Debtors also claimed a $600.00 exemption in it under 11 U.S.C. § 522(d)(5). TCF's exhibit 5 was a valuation for a 2000 Yamaha Wave Runner GP 760, which was totally inapposite. Steven's testimony regarding the condition of the jet ski supported the Debtors' valuation; TCF failed to carry its burden in refuting the Debtors' valuation.

The Debtors also jointly own a 1973 12' fishing boat, which was purchased at a farm auction approximately eighteen years ago for $65.00. The Debtors attribute a value of $150.00 to this boat, and claim an exemption in it in that amount under 11 U.S.C. § 522(d)(5). Steven credibly testified as to the value of the fishing boat. TCF failed to carry its burden in refuting the Debtors' valuation.

The Debtors also jointly own an 8' paddle boat, which was purchased about fifteen years ago for $250.00. The Debtors attribute a value of $100.00 to this boat, and claim an exemption in the same amount in it under 11 U.S.C. § 522(d)(5). Steven testified that the paddle boat is damaged in several respects—as the result of a tornado. Steven's testimony regarding the value of the paddle boat was credible; TCF failed to carry its burden in refuting the Debtors' valuation.

Steven also testified about the John Deere lawn tractor with a 42″ deck, powered by a 17 horsepower engine,[8] and a used dock, which the Debtors' valued at $400.00 and $700.00, respectively. The Debtors claimed both items as exempt under 11 U.S.C. § 522(d)(5). Once again, TCF failed to refute the Debtors' valuations.

### D. The Debtors' Claimed Exemptions and the Best Interest of Creditors Test

Under § 1325(a)(4), a chapter 13 plan must propose payments to unsecured creditors in an amount that is not less than they would receive in a hypothetical chapter 7 liquidation. 11 U.S.C. § 1325(a)(4); *In re Breeding*, 366 B.R. 21, 26 (Bankr. E.D.Ark.2007) (reciting the § 1325(a)(4) test). Given the above valuation determinations, TCF's objections to the claimed exempted property under § 522(d)(1), § 522(d)(2), and § 522(d)(5), are sustained in part to the extent that the Debtors have exceeded their § 522(d)(5) exemptions.[9] In all other respects, TCF's objections to the Debtors' claimed exemptions are overruled.

### E. The Debtors' Challenged Deductions/Expenses

Steven and Debra are above-median-income debtors. *See* Form 22C (ECF No. 1 and Ex. A). Under 11 U.S.C. § 1325(b)(3), and with respect to debtors with current monthly income exceeding the applicable median family income, courts are required to determine the amounts reasonably nec-

---

**7.** Steven testified that the jet ski was damaged when the Debtors' daughter was seriously injured in a collision with it.

**8.** TCF's Ex. 9 was a valuation for a different model tractor, one with a 38″ mower deck; this valuation is therefore inapposite.

**9.** *E.g.,* the Debtors conceded that Steven's § 522(d)(5) exemption exceeded the allowable amount. *See* Debtors' Response to Objection to Claim of Exemptions, ECF No. 23, p. 9, ¶ 19.

essary to be expended in accordance with the "means test," i.e., the statutory formula for determining whether a presumption of abuse arises in chapter 7 cases. *See* 11 U.S.C. § 1325(b)(3) ("[a]mounts reasonably necessary to be expended under paragraph (2) shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the debtor has current monthly income, when multiplied by 12, greater than [the applicable state median]"); *Ransom v. FIA Card Servs., N.A.,* — U.S. ——, 131 S.Ct. 716, 721–22, 178 L.Ed.2d 603 (2011) ("For a debtor whose income is above the median for his State, the means test identifies which expenses qualify as 'amounts reasonably necessary to be expended.' The test supplants the pre-BAPCPA practice of calculating debtors' reasonable expenses on a case-by-case basis, which led to varying and often inconsistent determinations."); *Hamilton v. Lanning,* 560 U.S. 505, 510 n. 2, 130 S.Ct. 2464, 177 L.Ed.2d 23 (2010) ("The formula for above-median-income debtors is known as the 'means test' and is reflected in a schedule (Form 22C) that a Chapter 13 debtor must file."). Under the means test, above-median-income debtors must use several standardized expenditure figures in lieu of their own actual monthly living expenses, see 11 U.S.C. § 707(b)(2)(A)(ii)(I). *See* Official Form 22C, lines 24–29. The standardized figures are derived from the IRS National Standards (for allowable living expenses and out-of-pocket health care) and IRS Local Standards (for housing, utilities and transportation expenses).

Above-median-income debtors also are permitted to deduct their "actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides[.]" *See* 11 U.S.C. § 707(b)(2)(A)(ii)(I); *Ransom,* 131 S.Ct. at 727 ("For the Other Necessary Expense categories … the debtor may deduct his actual expenses, no matter how high they are."). These Other Necessary Expenses include certain taxes, involuntary employment deductions, life insurance on the debtor, certain court-ordered payments, certain educational expenses, childcare, unreimbursed health care, and telecommunications services. *See* Official Form 22C, lines 30–37. "Expenditures of above-median-income debtors for other items—including health and disability insurance, contributions to the care of certain household or family members, protection against family violence, home energy costs in excess of the allowance specified by IRS Local Standards, certain limited educational expenses, additional food and clothing expenses in excess of the applicable IRS National Standards and a certain amount of charitable contributions—are based on debtors' own reasonably necessary needs." *Baud v. Carroll,* 634 F.3d 327, 333–34 (6th Cir.2011) (citing 11 U.S.C. § 707(b)(2)(A)(ii)(I)-(V); Official Form 22C, lines 39–45). Finally, the "means test and the Official Form allow certain deductions on account of ongoing payments contractually due on secured debts and priority claims without regard to whether those payments are reasonably necessary." *Baud v. Carroll,* 634 F.3d at 334 (citing 11 U.S.C. § 707(b)(2)(A)(iii)-(iv); Official Form 22C, lines 47–49).

As a preliminary matter, TCF has objected to—what it incorrectly referred to as—"a $600.00 per month clothing expense," but the Debtors' schedules reflect that their monthly clothing expense is $100.00 and their food expense is $600.00 per month. *See* Ex. A, Schedule J, lines 5, 4. Debra's testimony corroborated these amounts. Consequently, TCF's objection to the Debtors' clothing expense is unfounded.

TCF further contends that the Debtors' expenses for food ($600.00) is excessive and that the following expenses are not reasonably necessary: transportation $525.00/month; home maintenance $100.00/month; personal allowance-incidentals $155.00/month; and, taxes $400.00/month. TCF has also objected to Debra's monthly expenses for: long-term care insurance of $440.00; voluntary retirement contribution of $216.00; contributions to a flexible spending health care account of $92.00; and life insurance of $132.00, for a total of $880.00.

According to Schedule J, the Debtors' total monthly household and living expenses for their family of four is $1,215.00. *See* Ex. A, Schedule J, lines 3, 4, 5, 6, 7, 9, & 17.a. By way of comparison, the IRS Allowable Living Expense National Standards—effective 4/1/2013—for a household of four is $1,465.00/month. *See* Form 22C, line 24A. The Debtors' actual living expenses fall comfortably within the IRS National Standards.[10]

■ TCF also objects to the Debtors' monthly transportation expenses of $525.00. Granted, the Debtors, own, either jointly or outright,[11] five vehicles. It should be noted, however, that the "newest" model, the 2005 Chrysler Sebring, has over 165,000 miles on it. All of the rest of the vehicles are at least 11 years old and each has over 185,000 miles on it. If one looks at the local standards for transportation operating costs for two vehicles, the cost is $432.00. *See* Form 22C, line 27A. Debra testified that she drives 76 miles round trip to and from her place of employment five days each week. Based on the condition of the vehicles and the needs of the Debtors as articulated on the record, the Court finds that expenses of $525.00 per month are not unreasonable.

■ Debra also has $132.00 taken out of her paycheck each month for life insurance and disability insurance. TCF argues that this figure is unreasonable, however, it does not articulate any reason why it believes that to be the case. Both of these expenditures are allowable under the "Other Necessary Expenses" category on the means test form. *See* Form 22C, line

---

**10.** TCF also objects to the daughters being claimed as the Debtors' dependents, together with any expenses claimed for them. Debra testified that she' and Steven provided their daughters with "basic room and board," car repairs, car insurance, and that they are covered under the Debtors' medical and dental plan. Debra further testified that the daughters pay for the fuel for the vehicles they each use, pay for their cell phones, pay for their clothing, entertainment, and "an occasional oil change." Debra testified that both daughters have part-time, minimum wage jobs, and are unable to support themselves. She also pointed out that one daughter had a jet ski accident and suffered an injury to her left leg last summer; her condition has worsened to the point where she needs surgery, and will require a six-month recovery period. The other daughter suffers from depression and anxiety; she had been released from the hospital ten days before the date of the trial. Debra testified that the cost of life insurance

on the daughters was a mere ten cents per pay period. Presumably, the Debtors properly listed "four" on line 24A of the Form 22C (providing, in pertinent part, that "applicable number of persons is the number that would currently be allowed as exemptions on your federal income tax return, plus the number of any additional dependents whom you support"). This analysis assumes, for the sake of argument, that the Debtors' daughters are "dependents." *See* Official Form 22C, line 24A. Given the above expense analysis, the Court need not undertake an analysis of whether the daughters are properly considered as "dependents." Notably, TCF appears to give "the debtors the benefit of the doubt regarding expenses for their two adult children." *See* Hr'g Br. of Objector TCF National Bank, at 9 n. 1, ECF No. 22.

**11.** One daughter is a joint owner of the 2005 Chrysler Sebring; she also is the primary driver of it.

32 ($101.00 for life insurance) and line 39.b. ($30.00 disability insurance). Accordingly, the Court finds this expenditure to be appropriate.

■■■ TCF also objects to Debra's payroll deduction of $92.00 per month for a flexible health savings account. She testified credibly that although the family doesn't always use the full amount each month, the family uses the cumulative total over the course of a year "and then some." Additionally, the means test allows for such expenditure. *See* Form 22C, line 39.c. There is nothing unreasonable about this expense. (Indeed, such sum is deducted from Debra's gross income figure, thereby reducing the overall tax consequences on her full salary.)

■■■ Debra contributes $216.00 per month to a voluntary retirement account. She is now 61 years old (10 years younger than Steven), having contributed to this account since 2000, and "has no immediate plans to retire." TCF takes issue with these monthly contributions, although it does not articulate any specific reason why.

Courts are split on this issue. *See In re Parks,* 475 B.R. 703, 709 (9th Cir. BAP 2012) (above-median-income chapter 13 debtor's voluntary post-petition retirement contributions are not excluded from his or her disposable income; 11 U.S.C. §§ 541(a)(1), (b)(7)(A), 1325(b)(2); regardless of whether pre-petition contributions are voluntary, "§ 541(b)(7) does not authorize chapter 13 debtors to exclude voluntary post-petition retirement contributions in any amount for purposes of calculating their disposable income."); *In re McCullers,* 451 B.R. 498 (Bankr. N.D.Cal.2011) (debtor could not exclude voluntary post-petition retirement contributions regardless of whether the debtor was making the same pre-petition retirement contributions, although contribu-

tions to repay a 401(k) loan were properly excluded). *See also In re Seafort,* 669 F.3d 662 (6th Cir.2012) (income made available once debtors' 401(k) loan repayments were fully repaid was "projected disposable income" properly committed to the debtors' respective chapter 13 plans for distribution to the unsecured creditors and could not be used to make voluntary retirement contributions; 11 U.S.C. §§ 541(a)(1), (b)(7)(A), 1322(f); chapter 13 debtor's voluntary post-petition retirement contributions are protected from and are not included in the calculation of projected disposable income if such funds were either voluntarily contributed pre-petition or are paid towards a pre-petition 401(k) loan). *But see In re Drapeau,* 485 B.R. 29 (Bankr.D.Mass. 2013) (Bankruptcy Code provision excluding from property of the estate any amount withheld by employer from wages of its employees, or any amount received from employees, as contributions to an ERISA employee benefit plan, excludes post-petition voluntary contributions to retirement plans and annuities specified therein from scope of projected disposable income available for distribution to unsecured creditors of chapter 13 debtors, as long as these contributions are made in good faith; 11 U.S.C. §§ 541(b)(7), 1325(a)(3), (b)(1)(B), (b)(2); Employee Retirement Income Security Act of 1974, § 2 *et seq.,* 29 U.S.C. § 1001 *et seq.); In re Devilliers,* 358 B.R. 849 (Bankr.E.D.La.2007) (chapter 13 debtors' mandatory or voluntary contributions to qualified retirement plans, which were specifically excluded from "disposable income" by statute, were not subject to requirement that expenses deducted in calculating projected disposable income for plan confirmation purposes be reasonable and necessary; 11 U.S.C. §§ 541(b)(7), 1325(b)(2)). *See also In re*

*Jensen,* 496 B.R. 615 (Bankr.D.Utah 2013) (even if a chapter 13 debtor may exclude voluntary retirement contributions from disposable income, he or she still must demonstrate that the retention of such contributions is in good faith).

The Court finds the rationale employed by the courts in *Seafort, Drapeau, Devilliers,* and *Jensen* instructive. Because Debra has been making these voluntary contributions for the last 14 years, there is no reason to suggest that her motivation in doing so was anything but in good faith. Moreover, TCF failed to establish an evidentiary basis sufficient to refute Debra's testimony that this expense was appropriate under the circumstances. Accordingly, the Court allows the expense.

■■■ The Court now turns to the $400.00 per month the Debtors' claim as payment for additional taxes. *See* Ex. A, Schedule J, line 12. Debra already has $1,437.00 per month deducted from her paycheck. *See* Ex. A, Schedule I, lines 4.a.–c., inclusive. In contrast, the Debtors show the amount of $2,467.00 as payment for federal and state income taxes. *See*

Ex. A, Form 22C, line 30. This amount, however, would necessarily be higher since it "captures" the amounts paid in this category going back to the "CMI period"— current monthly income defined as the six-month period preceding the month of filing, which in this case was February through July 2013. *See* 11 U.S.C. § 101(10A). Steven was drawing his $45,000.00 per year salary during at least a portion of that time frame. He is now receiving Social Security income of $1,334.00 per month, as well as a pension of $2,085.00 per month from his former employment. *See* Ex. A, Schedule I, lines 17 and 12, respectively. There was no testimony regarding any withholding amounts for tax purposes of either revenue stream. Neither was there any evidence of the rate at which the Debtors were being taxed. No testimony was offered as to whether any portion of Steven's Social Security benefits were taxable. Because the record was devoid of any evidence to support the Debtors' claim of an additional $400.00 per month for state and federal income taxes, the objection of TCF as to that expense is sustained.[12]

12. For purposes of calculating a debtor's monthly expenses under the means test, a debtor's monthly expenses specified as "Other Necessary Expenses" shall be a debtor's actual monthly expenses in effect on the date of the order for relief. *See* 11 U.S.C. § 707(b)(2)(A)(ii)(I); *see also In re Washburn,* 579 F.3d 934, 936 (8th Cir.2009) ("It is undisputed that the separate term, 'actual monthly expenses,' refers to expenses that the debtor in fact incurs."); *In re Rudnik,* 435 B.R. 613, 614 (Bankr.D.Minn.2010) ("Debtors are not entitled to arbitrarily select tax withholding for paragraph 25 of Form B22A. Only actual tax liability can be used as the basis for the calculation."); *In re Robrock,* 430 B.R. 197, 208 (Bankr.D.Minn.2010) (income tax liability claimed by chapter 7 debtor, based upon withholding from his wages, had to be adjusted downward in light of evidence that debtor overwithheld and had history of regularly receiving tax refunds, and debtor would be allowed a deduction only in reduced amount

when performing "means test" calculation, for purpose of determining whether his Chapter 7 case was presumptively subject to being dismissed); *In re Balcerowski,* 353 B.R. 581, 587 (Bankr.E.D.Wis.2006) (to calculate his "disposable income," for purpose of determining whether proposed plan satisfied "projected disposable income" requirement, above-median-income Chapter 13 debtor had to subtract from his current monthly income monthly tax expense in amount equal not to taxes withheld each month from debtor's paycheck, but to debtor's best estimate of what his average monthly tax expense would be; "It follows, then, that the amount a taxpayer chooses to withhold from his paycheck is not necessarily the actual tax expense he will incur. In fact, the taxpayer gets back from the taxing authorities any amount he has overwithheld in the form of a tax refund. The amount that the taxpayer gets back is not, therefore, an amount 'reasonably necessary to

■ Finally, the Court turns to the most troublesome issue impeding the Debtors' path to an order confirming their plan—whether their monthly expense of $440.00 for long-term care is reasonable and necessary. *See* Ex. A, line 4.h. Perhaps it is easier to characterize this type of insurance in terms of what it is not: it is not health insurance; it is not life insurance; nor is it disability insurance. What, then, is it? Generally speaking, long-term care insurance covers out-of-pocket expenses for home health care, assisted living, adult daycare, respite care, hospice care, nursing home care, or care provided by facilities that treat patients who suffer from Alzheimer's and other dementia-related illnesses. Debra testified that she and Steven have been paying the premiums on this policy since 2000, and that she and Steven are the respective beneficiaries under the policy. There was a virtual dearth of testimony as to the necessity or the reasons why the Debtors opted to purchase such a policy. Nor was there any evidence produced that outlined the specific type of coverage provided by it. What are the exclusions? What is the deductible? These are questions that are not answerable from a review of the record.

There is no mention of "long-term care insurance" in the category of "other necessary expenses" set forth in § 707(b)(2)(A)(ii)(I). Similarly, there is no reference to this type of expense deduction in Official Form 22C. There is also a decided paucity of case law on this subject. In the case of *In re Rajender*, 2007 WL 2345018 (Bankr.E.D.Cal. Aug. 7, 2007), the

court mentioned long-term care insurance by referring to the version of the Form 22C in effect at the time, noting that "[o]ther necessary expenses may include state and federal income, self-employment, social security, and Medicare taxes; dental, vision, **long-term care,** and life insurance, ... and business expenses. *See* Lines 30–37 of Official Form 22C." *Id.* at *2 (emphasis added).[13] The court then denied confirmation of the debtor's plan, not on the basis of any long-term care expense (there was none), but because the debtor could not justify his excessive expenses for food, utilities, and taxes. *Id.* at *3.

The Court also came across a case that discussed the propriety of allowing debtors a deduction for long-term health care, albeit in the context of a challenge by the United States Trustee ("UST") under § 707(b)(1) and (3)—the totality of circumstances in a chapter 7 context. The court in *In re Roberts*, 2011 WL 2118857 (Bankr. D.Conn. May 25, 2011), denied the motion to dismiss. The UST challenged the debtors' expenditure of $815.00 per month for various forms of insurance, including $111.00 for long-term care insurance. The court accepted the debtors' expense figures because "[t]he UST recognized that the debtors carried those insurance policies because Mr. Roberts is an insurance salesman who believes these policies are 'appropriate and necessary to take care of his family' [but] offered no evidence to contradict the reasonableness of those expenses." *Id.* at *5 (citation omitted).[14]

be expended.' "). Here, and notwithstanding the reference on the Debtors' Schedule J to "[t]axes not withheld" in the amount of $400.00, the amount of the Debtors' actual (or even estimated) taxes was not established.

**13.** It is not clear why the court makes this statement, as no version of Official Form 22C has ever referenced "long-term care" as an

appropriate "other necessary expense." *See* Official Form 22C, versions (10/06), (12/10), and (04/13).

**14.** The Court recognizes that *Rajender* and *Roberts* are not "on all fours" with the circumstances of this case and that the cases are factually distinguishable from the record

It is not entirely clear why Mr. and Mrs. Melander have purchased long-term care insurance. Debra testified on cross-examination that the expense was both "necessary and reasonable," but did not elaborate. The record also reflects that the Melanders have been paying the premiums since 2000, and that both Steven and Debra are the respective beneficiaries, but there are no other details upon which the Court can justifiably rely in allowing the deduction of $440.00 per month for such insurance policy. For that reason, and since this type of expense is not listed in either § 707(b)(2)(A)(ii)(I) or § 707(b)(2)(A)(ii)(II) as "other necessary expenses," the Debtors must contribute that amount toward the calculation of PDI.

Here, the Debtors propose to pay only $130.00 per month. The plan does not provide for payment in full of all unsecured claims. TCF is the holder of an allowed unsecured claim. It objected to the plan as proposed by the Debtors. The Debtors' plan does not provide for payment of all the Debtors' PDI for the plan's applicable commitment period (here, five years). Accordingly, under § 1325(b)(1)(B), TCF's objection to confirmation of the plan is sustained.

■ Moreover, "[i]n the Eighth Circuit, [the] 'good faith' analysis under § 1325(a)(3) is focused on 'whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13.'" *In re Schachtele*, 343 B.R. 661, 668 (8th Cir. BAP 2006) (quoting *In re LeMaire*, 898 F.2d 1346, 1348 (8th Cir.1990) (citing *In re Estus*, 695 F.2d 311, 316 (8th Cir.1982))). Here, while the Court acknowledges some of the Debtors' testimony regarding their efforts to trim their budget, the spirit of chapter 13 would not be served were the Court to adopt the Debtors' proposed plan.

As such, denial of confirmation must be the outcome here.

**ACCORDINGLY, IT IS HEREBY ORDERED THAT:**

1. TCF's objections to the Debtors' claimed exempted property under § 522(d)(1), § 522(d)(2), and § 522(d)(5), are sustained in part to the extent that the Debtors have exceeded their § 522(d)(5) exemptions. In all other respects, TCF's objections to the Debtors' claimed exemptions are overruled.

2. TCF's objection to confirmation is sustained and confirmation of the Debtors' chapter 13 plan dated August 5, 2013 is denied.

made here. But, while the two decisions are unpublished, they do appear to evidence the relative scarcity of case law on this subject—in the context of chapter 13.